606 A.2d 509

**GEISINGER CLINIC, a Pennsylvania Non–Profit Corporation**

v.

**Nicholas W. DI CUCCIO, M.D., Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 12, 1991.

Filed April 3, 1992.

88

Jeffrey W. Stover, State College, for appellant.
Diane S. Danoff, Philadelphia, for appellee.
Robert A. Butler, pro se.

Before OLSZEWSKI, HUDOCK and BROSKY, JJ.

BROSKY, Judge.

This is an appeal from an Order entering a declaratory judgment in favor of Geisinger Clinic (Geisinger) and against Nicholas W. Di Cuccio, M.D., (Dr. Di Cuccio) appellant herein.

Dr. Di Cuccio raises for our consideration four issues: (1) The employment agreement is invalid because its terms are ambiguous and illusory, and, consequently, the restrictive covenant ancillary to the agreement is unenforceable; (2) The liquidated damages clause is an unconscionable forfeiture which renders it an invalid, unenforceable penalty clause; (3) The two year limitation of the restrictive covenant clause has expired because the terms thereof had begun to run at the time of the sale of the business; and (4) The trial court erred in awarding monetary damages without permitting Dr. Di Cuccio to file an answer and counterclaim to the complaint, thereby usurping Dr. Di Cuccio's right to a jury trial on his counterclaim to allow a set off on the amount of liquidated damages. We affirm.

We adopt the factual findings of the trial court as set forth in its Opinion of October 3, 1990. *See* 1–7.

Dr. Di Cuccio, together with the other physician/stockholders in the Clinton Association of Physicians and Surgeons, P.C. (CAPS) and Geisinger entered into a bilateral contract for the purchase of the assets of CAPS by Geisinger, the employment contract at issue here being ancillary to and a condition of the asset purchase agreement. *See* Opinion, 1, 2; Findings of Fact Nos. 3–5, 8. A bilateral contract is formed when one party to the contract promises to perform or to forebear from performing in exchange for the promised performance or forbearance of the other contracting party. *Greene v. Oliver Realty Co.,* 363 Pa.Super. 534, 526 A.2d 1192 (1987), *appeal denied,* 517 Pa. 607, 536 A.2d 1331 (1988).

As his first issue, Dr. Di Cuccio attacks the allegedly illusory provisions of Exhibit A of the ancillary employment agreement, relating to salary and additional compensation, in that the nature and extent of Geisinger's obligation in this regard are uncertain and amount, in effect, to no obligation on the part of Geisinger. Our reading of Exhibit A is not in accord with the interpretation proffered by Dr. Di Cuccio. Exhibit A of the employment agreement provides for an initial annual base salary of one hundred sixty-five thousand dollars, not to be reduced during the term of the agreement, provided that (1) Dr. Di Cuccio remain financially productive at the level as existed prior to the execution of the agreement; and (2) Geisinger's net revenues over its expenses for the fiscal year immediately preceding do not fall below eight percent of net revenues budgeted for CAPS. Moreover, additional compensation for Dr. Di Cuccio was provided for in Exhibit A in three respects:

(A) *Percentage of Net Revenue.* Dr. Di Cuccio is entitled to a percentage of net revenue in excess of his base salary, above, if the aggregate collected net revenues of Dr. Di Cuccio and three other physicians who were also parties to the agreement exceeds their aggregate base salary by a specific percentage to be annually reviewed and adjusted, if necessary.

(B) *Medical Director's Fund.* Dr. Di Cuccio would also be entitled to an annual discretionary bonus from a fund comprised of one percent of the net revenue. This discretionary bonus was to be awarded by the Medical Director of Geisinger to recognize non-income generating contributions by physicians of CAPS.

(C) *Group Bonus.* Dr. Di Cuccio would also receive a bonus in the amount of up to forty percent of CAPS' net revenues in excess of the budget if the expenses were at or below the budget and the income goals set forth in Exhibit A (relating to basic salary).

A contract is evidenced by a mutuality of obligation. A mutuality of obligation exists when both parties to the contract are required to perform their respective promises. If a mutuality of promises is absent, the contract is unenforceable. *Id.* A promise to perform or to forebear from performing must be supported by consideration. *Id.* If the promise is entirely optional with the promisor, it is said to be illusory and, therefore, lacking consideration and unenforceable. *Best v. Realty Management Corp.*, 174 Pa.Super. 326, 101 A.2d 438 (1953); J.D. Calamari & J.M. Perillo, *The Law of Contracts* § 4–17 (2nd ed. 1977). The promisor has committed him/herself to nothing. J.D. Calamari, *supra;* E.A. Farnsworth, *Contracts* § 2.13 (1982).

Dr. Di Cuccio argues that the additional compensation provisions of Exhibit A are illusory because the amounts of additional compensation are unascertainable. Dr. Di Cuccio maintains that under the additional compensation provisions of Exhibit A, Geisinger was not bound to pay any compensation to him beyond the one hundred sixty-five thousand dollar annual basic salary because the terms in which these additional compensation provisions are cast are illusory, i.e., they are optional with Geisinger and lack a return promise in exchange for the promise of Dr. Di Cuccio to render medical services to patients who come to Geisinger. A contract is enforceable when the parties thereto have reached a mutual understanding, have exchanged consideration and have delineated the terms of their bargain with sufficient clarity. *Greene v. Oliver Realty, Inc., supra.* An agreement is sufficiently definite if the parties intended to contract with each other and if a reasonably certain basis exists upon which a court could grant an appropriate remedy. *Id.*

The terms of the discretionary bonus provisions, we find, are sufficiently definite to withstand a claim of illusoriness or indefiniteness. Each additional compensation provision of Exhibit A states with sufficient clarity that it is discretionary. With respect to the basic salary provision, Geisinger promises to pay an annual salary in the amount of one

hundred sixty-five thousand dollars which Geisinger promises not to reduce in exchange for the CAPS physicians' promise to maintain certain levels of financial productivity and patient accessibility, provided that net revenues for the previous fiscal year do not fall below eight percent of budgeted net revenues after June 30, 1987.

Clause A, relating to the percentage of net revenue additional compensation provides that aggregated revenues must exceed the aggregate base salaries of the CAPS physicians by a certain percentage, which percentage is subject to annual review and adjustment. At the time of the execution of the asset purchase and employment agreements, the percentage was set out in the latter as forty-four point five percent. Therefore, Geisinger does promise the CAPS physicians a percentage net revenue bonus in exchange for the physicians' promise to provide medical care for Geisinger's patients. Clause B provides for a one percent annual allocation by the Medical Director, at his discretion, to award a bonus for non-revenue generating contributions. Therefore, Geisinger also promises to award a bonus to group member physicians for any non-revenue generating contribution to Geisinger in exchange for the physicians' promise to treat Geisinger's patient. Clause C allows for a bonus to the CAPS physicians in an amount up to forty percent of its net revenues in excess of the budget if expenses are maintained at or below budget levels and if income goals are attained. Should expenses be kept at or below budget level, Geisinger promises the CAPS physicians a bonus for a certain percentage figure in exchange for the physicians' promise to keep expenses at least at the budget level and to attain specific income goals.

In sum, each of the above provisions spells out with definiteness and clarity the responsibilities, duties and expectations of all the parties to the agreement. Geisinger is bound by its promise to pay certain salaries and bonuses once certain net revenue levels have been attained and so long as the CAPS physicians maintain a certain degree of professional responsibility to Geisinger. We see nothing

illusory, indefinite or one-sided about this arrangement. Moreover, the record indicates that the employment agreement and its Exhibit A were a product of arms-length bargaining between knowing, willing and sophisticated business people. This is especially pointed up by the fact that Dr. Di Cuccio personally received the sum of five hundred twenty thousand four hundred forty-six dollars and fifty-seven cents, ($520,446.57), plus interest from Geisinger on the purchase price of CAPS. Finding of Fact No. 4. Therefore, Dr. Di Cuccio is bound by the terms of this agreement. *Boyce v. Smith–Edwards–Dunlap Co.*, 398 Pa.Super. 345, 580 A.2d 1382 (1990). Since we are unable to conclude that the employment agreement fails for indefiniteness or was cast in illusory terms, we are similarly unable to find that the restrictive covenant provision of the employment agreement was unenforceable. We note that Geisinger's employment of Dr. Di Cuccio would constitute consideration for the latter's acceptance of the terms of the employment contract and, in particular, of the covenant not to compete in any event. *Morgan's Home Equipment Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1953). *See also Records Center, Inc. v. Comprehensive Management, Inc.*, 363 Pa.Super. 79, 525 A.2d 433 (1987), and *Barb–Lee Mobile Frame Co. v. Hoot*, 416 Pa. 222, 206 A.2d 59 (1965).

We will next move to Dr. Di Cuccio's third issue in which he maintains that the two-year limitation of the restrictive covenant began to run at the time of the execution of the asset purchase and employment agreements and has, therefore, terminated.

Under the terms of the asset purchase agreement, Dr. Di Cuccio, together with the other CAPS physicians, was required to enter into an employment agreement with Geisinger. Finding of Fact No. 8. The latter agreement was ancillary to the former and included a clause of non-competition. Both agreements were executed by Dr. Di Cuccio on May 2, 1986. On January 23, 1990, Dr. Di Cuccio informed Geisinger that he would be terminating his employment with the latter on February 28, 1990. Finding of Fact No.

13. Dr. Di Cuccio subsequently began to practice medicine within a few miles of Geisinger, taking with him three other employees. Before he left Geisinger, Dr. Di Cuccio informed his patients that he would be taking care of them at his new location. Since that time, patients whom Dr. Di Cuccio had formerly treated at Geisinger were receiving medical care from Dr. Di Cuccio at his new office. Findings of Fact Nos. 17, 18, 19.

The non-competition clause of the employment agreement between Dr. Di Cuccio and Geisinger reads as follows:

8. *NONCOMPETITION*

(a) It is understood and agreed that Physician shall not, *following termination of employment,* directly or indirectly, enter into the practice of medicine ... within the restricted area described by a radius of fifty (50) miles from such medical office facility designated as the principal site of physician's medical office at the time of such termination. *This restriction shall endure for a period of two years from the date of termination of this Agreement* and regardless of the grounds, if any, therefor. It is understood that this restriction is necessitated in part because of the time, effort, and resources required by Geisinger in connection with said Asset Purchase Agreement and, otherwise, in the development and maintenance of Physician's practice and in the event that Physician's relationship with Geisinger is terminated, the additional time and effort necessary to re-establish the practice which the Physician leaves. In the event the provisions of this section are deemed to exceed the time, geographic, or occupational limitations permitted by applicable law, then such provisions shall be automatically reformed to the maximum time, geographic, or occupational limitation permitted by applicable law.

First emphasis in text; second emphasis supplied. As noted, the restrictive covenant clause bars Dr. Di Cuccio from practicing medicine for two years from the termination of his employment with Geisinger. "Termination" is provided

for in the employment agreement between Geisinger and the CAPS physicians as follows:

7. *TERMINATION*

(a) Either party may at any time *terminate* this Agreement *upon thirty (30) days prior written notice to the other* ....

(b) Physician understands and agrees that (i) *his resignation or his other voluntary termination* of this Agreement ... may result in [pursuance] ... of remedies at law or in equity [which] Geisinger may assert, *including the provisions of the following paragraph 8* [the non-competition clause, *supra*]. It is understood that, solely for the purposes of this Paragraph 7(b), the phrase 'termination' shall not include Physician's death, the circumstances described in subparagraph (c) below, incurrence of a disabling illness or injury which substantially interferes with his ability to carry out his duties hereunder or the release from employment, initiated by Geisinger without cause.

(c) This Agreement is automatically terminated upon Physician's attainment of the age of seventy years.

First emphasis in text; subsequent emphasis supplied.

On January 23, 1990, Dr. Di Cuccio notified Geisinger in writing that he would be leaving the employ of the latter on February 28, 1990. Pursuant to the terms of Paragraph Seven, above, resignation of employment terminates the employment agreement with Geisinger. This is further evidenced by the language of Paragraph Eight which indicates that its two-year restrictive provision is triggered by termination of employment which, in turn, effects cessation of the employment agreement.

Therefore, when Dr. Di Cuccio left its employ on February 28, 1990, he terminated his employment agreement with Geisinger, thereby triggering the restrictive covenant provisions of Paragraph Eight thereof. In accordance with the plain terms of Paragraph Eight, then, Dr. Di Cuccio was barred from the practice of medicine within a fifty mile radius of Geisinger for a period of two years from February

28, 1990 to February 28, 1992. *See Boyce v. Smith–Edwards–Dunlap Co., supra.* In that case, we interpreted a non-competition clause in an employment agreement restricting involvement with a competing business for two years after Boyce's period of employment with the employer to bar Boyce's involvement with a competitor for a two-year period *following* termination of his employment with the predecessor to Smith–Edwards.

Similarly, the language of the restrictive covenant in this case is patently clear that the two-year bar takes effect *only after* the employment agreement has been terminated. We have already determined that the employment agreement is terminated upon cessation of employment by a CAPS physician with Geisinger. Therefore, Dr. Di Cuccio's arguments in his Brief to this court to the contrary do not in any way undercut the plain language of the restrictive covenant clause of the employment agreement. We will not engage in a strained reading of contractual provisions which are clear on their face. *See Greene v. Oliver Realty Co., Inc., supra.* The meaning of the restrictive covenant, therefore, must be determined by its contents, alone, for a court cannot supply or substitute contractual terms which are inconsistent with the parties' intent, the paramount goal of contract interpretation. *Id.* The record is devoid of fraud, collusion, overreaching or unequal bargaining power between the parties. In fact, Dr. Di Cuccio does not even allude to any of these improprieties. His argument is, instead, an indication of a relationship gone sour, and he now seeks to have this court rewrite the terms of the employment agreement to vindicate his discontent. This we decline to do.

In his second issue on appeal, Dr. Di Cuccio contends that the liquidated damages clause constitutes an unconscionable and unenforceable penalty clause. The targets of Dr. Di Cuccio's attack in this regard are the waiver payment provision of the non-competition clause of the employment agreement and a clause in the asset purchase agreement

providing for reduction of the purchase price in the amount of a terminating shareholder's proportionate interest.

The clause in the asset purchase agreement providing for purchase price reduction in the proportionate amount of a terminating shareholder's interest reads in relevant part:

1.4 *Purchase Price.* [Sets forth purchase price]

 (a) * * *

 (b) * * *

 (c) The payment of the full amount of the Adjusted Balance is expressly contingent upon the continued employment of the Shareholders pursuant to their respective Professional Employment Agreements with the Geisinger Clinic. *If on or before January 2, 1990,* a Shareholder's employment with Geisinger Clinic, [sic] has terminated pursuant to the provisions of paragraph 7(b) of said Professional Employment Agreement [*supra*], the amount then unpaid to Sellers [Geisinger] shall be reduced by the proportionate Shareholder interest held by such terminating Shareholder and set forth in Exhibit 1.4(c)....

First emphasis in text; second emphasis supplied. Dr. Di Cuccio's argument with regard to Paragraph 1.4(c) of the asset purchase agreement is devoid of merit as the above provision has no application to the facts at bar. Dr. Di Cuccio terminated his employment with Geisinger on February 28, 1990. We have already determined Dr. Di Cuccio's termination of employment with Geisinger was pursuant to Paragraph Seven "(b)" of the employment agreement. The plain language of clause 1.4 4(c), above, indicates that the price reduction provision applies only to terminations effected on or before January 2, 1990. Therefore, this provision does not affect Dr. Di Cuccio's termination of employment. Moreover, the trial court entered judgment in favor of Geisinger only in the amount of Dr. Di Cuccio's compensation for the twelve months in question, or one hundred ninety-four thousand one hundred sixty-six dollars and thir-

teen cents ($194,166.62).[1] Finding of Fact No. 12. This amount represented the liquidated damages agreed to by the parties to the employment agreement in the event of a breach of the non-competition clause of the agreement by any of the CAPS physicians. Therefore, Dr. Di Cuccio's argument that he would have been required to pay approximately five hundred thousand dollars ($500,000.00) in addition to one hundred sixty-five thousand dollars ($165,000.00) (his then annual salary) had he terminated the day after signing the employment agreement is irrelevant under the facts as they actually occurred.

Dr. Di Cuccio's argument regarding the invalidity of the waiver payment provision of the non-competition clause as a penalty or forfeiture is equally unavailing. Paragraph Eight "(b)" of the non-competition clause reads as follows:

(b) If Physician desires to establish a practice within the restricted area during the two-year period following termination, Geisinger will waive this restriction upon the payment to it of a sum (the "Waiver Payment"), the amount of which shall be the greater of either: (i) One Hundred Sixty Five Thousand ($165,000) Dollars; or (ii) the total compensation paid Physician during the 12 calendar months preceding the month in which the termination occurred. It is further agreed and understood that because the financial burdens Geisinger would endure are difficult to ascertain and quantify, the amount of the Waiver Payment is a fair amount to pay as liquidated damages, and not as a penalty, in the event Physician desires to establish a practice within the restricted area during the two-year period.

Early in the history of our court, we delineated the four criteria to differentiate a liquidated damages provision from

1. The trial court found as a fact that Dr. Di Cuccio's salary for the prior twelve months in question to be one hundred ninety four thousand one hundred sixty-six dollars and thirteen cents ($194,-166.13), although it entered judgment in the amount of one hundred ninety-four thousand one hundred sixty-six dollars and sixty-two cents ($194,166.62). The parties cite the latter figure in their respective appellate briefs as the amount of liquidated damages. We will accept this figure also.

a penalty or forfeiture term in a restrictive covenant clause of an employment agreement.

(1) 'When, independently of the stipulation, the damages would be wholly uncertain and incapable or very difficult of being ascertained, except by mere conjecture, then the damages will usually be considered liquidated:'

(2) 'Where a party binds himself in a sum named not to carry on any particular trade, business or profession, within certain limits or within a specified period of time, the sum named will be regarded as liquidated damages and not as a penalty:'

(3) 'A sum fixed as security for the performance of a contract containing a number of stipulations of widely different importance, breaches of some of which are capable of accurate valuation, for any of which the stipulated sum is an excessive compensation, is a penalty.'

(4) 'When the covenant is for the performance of a single act or several acts, or the abstaining from doing some particular act or acts, which are not measurable by any exact pecuniary standard, and it is agreed that the party covenanting shall pay a stipulated sum as damages for a violation of any of such covenants, that sum is to be deemed liquidated damages and not a penalty:'

*Stover v. Spielman,* 1 Pa.Super. 526, 530–31 (1896), *quoting* 1 Sedgwick, *Measure of Damages* 549 (8th ed. 1891). *Stover* involved an agreement to purchase a bakery/confectionery business. The court held that the sale included the good will of the business, as well. Mr. Spielman agreed not to engage in the bakery/confectionery business in the borough of Greencastle and within a five mile radius thereof, nor would he be employed as a clerk in any bakery/confectionery business within a four mile radius. The restrictive covenant provision recited that for violation thereof, Mr. Spielman agreed to pay the amount of eight hundred dollars ($800.00) to Mr. Stover as liquidated damages. Mr. Spielman contended that the eight hundred dollars damages amounted to a penalty. This court rejected Mr. Spielman's argument. In doing so, it analyzed the case utilizing each

of the above four criteria and concluded that each had been met to construe the eight hundred dollar damage clause as a liquidated damages provision rather than as a penalty clause.

We held, first, that the actual damages were uncertain and difficult to ascertain given that the actual amount of loss might increase with each year. We also held that the amount of damages was reasonable in light of the fact that the sale of the business included its good will and a covenant not to conduct the same type of business within a certain geographic area. Relying upon *Kelso v. Reid*, 145 Pa. 606, 23 A. 323 (1892), an earlier decision of our supreme court regarding restrictive employment covenants, we concluded that criteria numbers one and two had been met to sustain the eight hundred dollar damage clause as one for liquidated damages. Secondly, we noted that the non-competition clause in the sales agreement concerning Mr. Spielman's employment as a bakery/confectionery clerk at another bakery/confectionery in Greencastle or his opening of a bakery/confectionery business in that same area referred to the same employment restriction, i.e., a promise not to engage in the same type of business which Mr. Spielman had sold to Mr. Stover. On that basis, we concluded that criteria numbers three and four had been satisfied to classify the eight hundred dollar figure as a liquidated damages clause rather than one for penalty.

The principles outlining the differences between liquidated damages and penalties in *Spielman v. Stover, supra*, have been applied more recently to illustrate the problem regarding the unascertainability and difficulty of predicting actual damages in contract actions. In *Commonwealth v. Musser Forests, Inc.*, 394 Pa. 205, 146 A.2d 714 (1959), our supreme court held that damages which are intended to be compensatory because of the indeterminate extent of the loss incurred are liquidated, rather than penal in nature.

Relying upon *Kunkel & Jordan v. Wherry*, 189 Pa. 198, 42 A. 112 (1899), this court, more recently in *Holt's Cigar Co. v. 222 Liberty Associates*, 404 Pa.Super. 578, 591 A.2d

743 (1991), held that the lynchpin of a liquidated damage clause is compensation for damages sustained. The court further observed that a provision which represents a good-faith and reasonable forecast of anticipated damages for breach which are otherwise difficult to prove with certainty will be construed as one for liquidated damages rather than for punishment or to secure compliance. This court characterized liquidated damages as a measure of foreseeable business losses or as damages for loss of good will. If no measure of compensation is intended, the damages clause is a penalty to secure compliance. *Id.* In that case, we reiterated the factors to which we must look in deciding whether the damages are liquidated or for penalty:

> The question [of whether stipulation is a penalty or a valid liquidated damages provision] ... is to be determined by the intention of the parties, drawn from the words of the whole contract, examined in the light of its subject-matter and its surroundings; and in this examination we must consider the relation which the sum stipulated bears to the extent of the injury which may be caused by the several breaches provided against, the ease or difficulty of measuring a breach in damages, and such other matters as are legally or necessarily inherent in the transaction.

404 Pa.Superior Ct. at 587, 591 A.2d at 747, *quoting Commonwealth v. Musser Forests, Inc., supra,* 394 Pa. at 212, 146 A.2d at 717. In *Holt's* the five hundred dollar *per diem* damage clause for delay in construction was construed to be a penalty to force compliance with the work schedule rather than as a reasonable forecast of business loss damage due to delay and was therefore unenforceable as a matter of public policy.

 Here, the waiver payment provision of the restrictive covenant clause of the employment agreement meets the above-stated criteria of the foregoing case law. Paragraph Eight "(a)" of the non-competition clause reads in part:

> It is understood that this restriction [the temporal and geographic limitation of a future medical practice] is necessitated in part because of the time, effort, and

resources required by Geisinger in connection with said Asset Purchase Agreement and, otherwise, in the development and maintenance of Physician's practice [sic] and in the event that Physician's relationship with Geisinger is terminated, the additional time and effort necessary to re-establish the practice which the Physician leaves.

Paragraph Eight "(b)" of the non-competition clause—the waiver payment provision—states:

[B]ecause the financial burdens Geisinger would endure are difficult to ascertain and quantify, the amount of the Waiver Payment is a fair amount to pay as liquidated damages, and not as a penalty, in the event Physician desires to establish a practice within the restricted area during the two-year period [as set forth in Paragraph "(a)" ].

These provisions, we hold, satisfy the first, second and fourth criteria of a legally acceptable liquidated damages provision as set forth in *Stover v. Spielman, supra,* as these provisions convey the intent of compensation of Geisinger for unquantifiable business losses due the premature departure of Dr. Di Cuccio from its employ for the purpose of establishing a medical practice in competition with Geisinger within the prohibited temporal and geographic bounds of the non-competition clause. The above-recited provisions also fulfill the third criterion of *Stover, supra,* in that they refer to the same matter, i.e., termination of employment with Geisinger in order to establish a competing medical practice within the otherwise prohibited bounds of the covenant, and the amount of damages so stipulated is solely for the purpose of protecting Geisinger in this event.

Our reading of the non-competition clause leads us to conclude that the waiver payment amounts to no more than a liquidated damages provision to compensate Geisinger for anticipated business or good will losses if the event described in Paragraph Eight "(a)" occurs and that it represents a reasonable forecast of damages which would be otherwise unquantifiable as a measure of compensation to Geisinger. *Musser Forests, Inc., supra; Holt's, supra.* It

is not designed to secure compliance with the terms of the employment agreement or to punish Dr. Di Cuccio for terminating. *Id.* In fact, the employment agreement does not prohibit Dr. Di Cuccio or any other physician from terminating his or their employment relationship(s) with Geisinger, nor does it threaten Dr. Di Cuccio or any other CAPS physician with any sanction for voluntary termination.

 Generally, a restrictive employment covenant may be enforced if it is ancillary to an employment agreement or a contract for the sale of a business and if it is necessary to protect the legitimate interests of the employer or the purchaser of a business. *Westec Security Services, Inc. v. Westinghouse Electric Corp.,* 538 F.Supp. 108 (E.D.Pa.1982) (interpreting Pennsylvania law). Specifically, restrictive covenants ancillary to the sale of a business, as here, are designed to protect, in addition to physical assets and investments, the good will of the business, i.e., its name, reputation and reliability. *Morgan's Home Equipment Corp. v. Martucci, supra.* For that reason, a restrictive covenant ancillary to the sale of a business promotes "goodwill [as] a saleable asset 'by protecting the buyer in the enjoyment of that for which he pays.'" *Westec, supra,* at 121, *quoting* 6A Corbin, *The Law of Contracts,* §§ 1385, 1387, and *citing Morgan's Home, supra.* It is the interference with or the destruction of the good will purchased with the physical attributes of the business which is unascertainable and unquantifiable in terms of actual loss, thereby triggering the necessity for a liquidated damages clause. *See John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164 (1977), and *Robert Clifton Associates, Inc. v. O'Connor,* 338 Pa.Super. 246, 487 A.2d 947 (1985). Therefore, the language contained in Paragraphs Eight "(a)" and "(b)" with respect to protecting Geisinger's interest in its investment and its inability to quantify or ascertain with specificity any losses which it would incur in the event of a breach of the non-competition clause by any CAPS physician was proper.

In light of the above, we hold that the waiver payment provision of the non-competition clause of the employment agreement between Dr. Di Cuccio and Geisinger represents a valid liquidated damages clause, rather than a penalty, designed to reasonably protect Geisinger in its purchase of both the physical assets and the good will of CAPS and that the loss suffered by Geisinger as a result of Dr. Di Cuccio's untimely termination of his employment relationship with Geisinger and his subsequent establishment of a competing medical practice within the prohibited temporal and geographic bounds of the restrictive covenant is unascertainable and unquantifiable so as to justify the imposition of damages as bargained for by the parties, themselves.

Lastly, Dr. Di Cuccio complains that the trial court, in entering a declaratory judgment in favor of Geisinger in the amount of one hundred ninety-four thousand one hundred sixty-six dollars and sixty-two cents ($194,166.62), which is the amount of liquidated damages to which Geisinger was entitled under Paragraph Eight "(b)" of the employment agreement, did so without affording him the right to assert a counterclaim for a set-off on which he would have otherwise been entitled to a trial by jury.

The purpose of awarding declaratory relief is to finally settle and make certain the rights or legal status of parties. *New London Oil Co., Inc. v. Ziegler*, 336 Pa.Super. 380, 485 A.2d 1131 (1984). Section 7533 of the Declaratory Judgments Act, 42 Pa.C.S.A. §§ 7531 *et seq.*, provides in relevant part: "Any person interested under a ... written contract ... may have determined any question of construction or validity arising under the ... contract ... and obtain a declaration of rights, status, or other legal relations thereunder." Additionally, Section 7534 states: "A contract may be construed either before or after there has been a breach thereof." *See also New London Oil, supra.* Moreover, we have held that a declaratory judgment proceeding is a proper form of action in which to determine the validity of a restrictive covenant of employment. *Bahleda v. Hankison Corp.*, 228 Pa.Super. 153, 323

A.2d 121 (1974); *Wilshire v. Penn Overall Supply Co.*, 227 Pa.Super. 30, 33, 323 A.2d 239, 240 (1974).

 Here, the trial court first construed the waiver payment provision of the restrictive covenant as a valid liquidated damages clause rather than as a void penalty provision. The court then declared the right of Geisinger to receive this waiver payment pursuant to the terms of the restrictive covenant. Having so declared the validity of the waiver payment clause and the right of Geisinger to receipt of the waiver payment, the trial court then proceeded to enter judgment for the amount of the waiver payment, plus interest, in favor of Geisinger.

Dr. Di Cuccio now contends that he had reserved the right to counterclaim for a set-off against the judgment and that the trial court's refusal to amend the Order entering judgment to make it subject to the establishment of any counterclaim denied him the right to a trial by jury on his counterclaim. We disagree.

For the first time in a Motion for rehearing filed subsequent to the Order of April 1, 1991, entering a declaratory judgment in favor of Geisinger, Dr. Di Cuccio raised the issue of counterclaiming for a set-off of damages. This contention was not included among Dr. Di Cuccio's exceptions filed to the decree *nisi* entered on October 3, 1990, awarding a declaratory judgment in favor of Geisinger. It was also not included in Dr. Di Cuccio's Brief filed in support of his exceptions to the decree *nisi*.

Aside from the possibility of this issue having been waived on appeal, it is meritless in any event. First, no indication appears of record that Dr. Di Cuccio, as he claimed at the May 31, 1991, hearing, had reserved his right at any time to file a counterclaim. Counsel for Dr. Di Cuccio stated at the hearing of May 31, 1991, that this understanding had been reached by the court and the parties at a prior court conference of an unspecified date. However, no transcription or other documentation of this court conference appears in certified record of this case.

Secondly, at the hearing on the Motion held on May 31, 1991, the court requested counsel for Dr. Di Cuccio to delineate the specific contours of the proposed counterclaim. Counsel responded that the purpose of the counterclaim would be to set off some unspecified amounts which Geisinger had purportedly deducted from the monies which were actually allegedly due Dr. Di Cuccio. Counsel also alluded to some other various undefined "calculations made throughout the life of the contract, not just the final payment, that were made purely by Geisinger within their discretion which Doctor Di Cuccio would challenge as being accurate." N.T. May 31, 1991, 9. Other than these bald statements, counsel never imparted to the trial court, nor are we able to glean from a reading of his appellate brief, the specific calculations or withheld monies now claimed by Dr. Di Cuccio and the factual predicate therefor.

Notwithstanding, counsel then requested the court to amend its final Order entering the declaratory judgment to allow for the determination of damages subject to a counterclaimed set off, even though counsel conceded that Dr. Di Cuccio had not at the pleading stage filed any counterclaim for a set-off because he did not wish to stall the progress of the case to final determination of the validity of the employment agreement—specifically, the restrictive covenant clause—and because of an alleged prior reservation to file a counterclaim at a later date. Counsel also acknowledged that the entry of judgment for the amount of liquidated damages provided for in the employment agreement would be subject to any counterclaimed set-off only if Dr. Di Cuccio could first establish his right to the latter. As we have already seen, counsel for Dr. Di Cuccio was unable to articulate any specific factual basis for the counterclaim at the hearing before the trial court. He has similarly failed here on appeal.

Dr. Di Cuccio filed an Answer and New Matter to Geisinger's amended Complaint in Equity in which he attacked the validity and enforceability of the employment agreement for failure of consideration on the basis of vagueness,

indefiniteness and illusoriness. He also averred that the non-competition clause of the employment agreement was void as being violative of public policy. Dr. Di Cuccio did not, as part of this pleading or anywhere else in the record, file the counterclaim which he now maintains he has the right to assert. Our review of the record does not indicate that Dr. Di Cuccio was ever precluded, prior to the entry of judgment, from asserting any set-off which he now claims that he is due.

■■ Counsel for Dr. Di Cuccio indicated at the hearing of May 31, 1991, that he had not asserted a counterclaim for set-off because he did not wish to stall the declaratory judgment proceeding by having to litigate his claims. However, at the hearing, he requested the court to amend its Order to make the judgment entered therein for liquidated damages subject to any recovery as a result of a yet-to-be-filed counterclaimed set-off, the factual predicate for which, as we have seen, counsel was unable to impart to the court when requested to do so. The court recommended to Dr. Di Cuccio that he file a separate action to accomplish this purpose. Whether at law or in equity, a party may file a separate action for the claims upon which he would otherwise rest his counterclaim. *See Oak Lane Shopping Center v. Flame*, 264 Pa.Super. 9, 398 A.2d 721 (1979) (equity action) and *American Telephone and Telegraph v. Clifford*, 406 Pa.Super. 128, 593 A.2d 903 (1991) (action at law). Therefore, the court acted properly in refusing to amend the Order to allow for the possibility of a set-off, especially in light of counsel's inability to articulate the basis therefor and because of the availability of the remedy of filing an independent cause of action to assert this same alleged claim.

■■ Moreover, even if the court had acceded to counsel's request to amend the Order, it does not follow that Dr. Di Cuccio would have been entitled to a jury trial on his claim for set-off. Pennsylvania Rule of Civil Procedure 1602 states: "In any action at law or in equity, a party may include in the claim for relief a prayer for declaratory relief

and the practice and procedure shall follow, as nearly as may be, the rules governing that action." Since Geisinger had included in its Complaint a count requesting declaratory relief, this rule governs here. A proceeding for declaratory relief under Rule 1602 does not afford a party an independent right to a jury trial other than what he/she/it may be entitled to on the underlying cause of action. *Brenckle v. Arblaster*, 320 Pa.Super. 87, 466 A.2d 1075 (1983); 42 Pa.C.S.A. § 7539(b). Therefore, a claim for declaratory relief made pursuant to Rule 1602 may be part of an action at law or one in equity and will proceed in accordance with the rules governing the applicable action. *Id.; Brenckle v. Arblaster, supra.*

■ Geisinger filed a Complaint in Equity in which it asserted, *inter alia*, a claim for relief requesting a declaration that Dr. Di Cuccio is in breach of the non-competition clause of the employment agreement, that the waiver payment provision of the clause is binding and valid and that as a result thereof, Geisinger is entitled to liquidated damages as set forth in that provision. Geisinger also sought, alternatively, a claim for injunctive relief. Geisinger's amended Complaint in Equity also included separate counts for various claims sounding in tort and in contract. These counts were discontinued after the Order of April 1, 1991, entering a declaratory judgment in favor of Geisinger had been filed but before the hearing of May 31, 1991. Thus, on the date of the hearing, at which Dr. Di Cuccio first asserted his right to file a counterclaim for set-off and his right to a jury trial therefor, only two counts of the Complaint remained— one for declaratory relief and the other for the alternative remedy of injunctive relief.

Since we conclude that Geisinger's action, as nearly as may be,[2] sounded in equity, rather than at law, any counterclaim which Dr. Di Cuccio could have asserted in any event would have been required to conform to the requirements of Pa.R.Civ.P. 1510 for the pleading of counterclaims to actions in equity. Rule 1510 states:

**2.** *See Brenckle v. Arblaster, supra,* and Pa.R.Civ.P. 1602, *supra, in text.*

(a) A defendant may plead as a counterclaim only a cause of action, whether equitable or legal, which arises from the same transaction or occurrence or series of transactions or occurrences from which the plaintiff's cause of action arose. . . .

(b) A counterclaim shall be pleaded and tried as an action in equity.

It thus appears that under Rule 1510, it matters not whether the counterclaim rests in equity or at law. If it arises out of the same transaction or occurrence from which the plaintiff's cause in equity arose, it must be litigated as an equity matter.

 Geisinger requests performance on the part of Dr. Di Cuccio for the payment of liquidated damages in the amount agreed to by the parties according to the formula prescribed in Paragraph Eight "(b)" of the employment agreement. Dr. Di Cuccio indicated to the trial court at the May 31, 1991, hearing and now states to this court that his proposed counterclaim would be in the nature of a set-off to the liquidated damages which the trial court found due and owing and upon which the court entered a declaratory judgment in favor of Geisinger. We construe Geisinger's request for relief as one for specific performance for payment of the liquidated damages due it under the terms of the employment agreement. As such, it is an equitable remedy which permits a court to compel performance of a contract when there exists in the contract an agreement between the parties as to the nature of the performance. *Cimina v. Bronich*, 349 Pa.Super. 399, 503 A.2d 427 (1985), *reversed, granting specific performance*, 517 Pa. 378, 537 A.2d 1355 (1988); *Turner v. Hostetler*, 359 Pa.Super. 167, 518 A.2d 833 (1986). In this case, the employment agreement set forth the nature of the performance to which the parties agreed. If Dr. Di Cuccio terminated his employment with Geisinger before the end of the two-year restriction and embarked upon a competing medical practice within the prohibited geographical bounds of the restrictive

covenant, he would be required to perform on his agreement to pay liquidated damages.

This being the case, Dr. Di Cuccio was not entitled to a jury trial on any counterclaim which he could have asserted. A party who chooses to assert a counterclaim at law in an equity action, rather than to file an independent cause of action at law on the same matter waives his right to have these issues of fact determined by a jury. *Rosenberg v. Rosenberg*, 322 Pa.Super. 293, 469 A.2d 626 (1980). *See also Brenckle v. Arblaster, supra. Cf. United States v. Wade*, 653 F.Supp. 11 (E.D.Pa.1984) (in declaratory judgment proceeding declaring liability for payment of response costs under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 *et seq.*, underlying remedy is equitable in nature and invokes no right to a jury trial).

Order affirmed.